David CARRADINE, Appellant,

v.

UNITED STATES, Appellee.

No. 79–100.

District of Columbia Court of Appeals.

Argued March 11, 1980.

Decided Sept. 23, 1980.

———

William J. Mertens, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D. C., was on the brief, for appellant.

Richard C. Bicki, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty. at the time the brief was filed, John A. Terry, Peter E. George, and Alexia Morrison, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEBEKER, FERREN and PRYOR, Associate Judges.

FERREN, Associate Judge:

The trial court revoked David Carradine's probation after he voluntarily appeared in court, requesting more intensive psychotherapy than the outpatient care he was receiving as an express condition of probation. On appeal, Carradine asserts that the trial court's action deprived him of due process and, in any event, was an abuse of discretion, as there was no allegation or proof that he had violated the terms of his probation. We agree that Carradine was denied due process. We reverse the revocation order.[1]

## I.

On February 14, 1978, appellant David Carradine pleaded guilty to the charge of rape. D.C.Code 1973, § 22–2801. The trial court sentenced him to prison for a term of 15 years to life. The court suspended execution of the sentence, however, and placed Carradine on "strictly–supervised" probation for five years, subject to periodic court review and extension as warranted.

At the sentencing on May 23, 1978, the court announced specific conditions of probation, including:

> Mr. Carradine [is to] remain in the Stepping Stones program and continue to participate in the Alcoholics Anonymous program; three, he has no choice in the matter, he must receive psychotherapy; fourthly, he must scrupulously comply with all probation regulations, including regular reporting; and, fifthly, there will be a review in open court of his probation every four months beginning September 12th, 1978. And I, of course, will receive regular reports from the Probation Office during that time.

> One of the terms of the probation is that Mr. Carradine appear, beginning September 12, 1978, at nine o'clock in the morning in any court in which I may be sitting.[2]

1. In view of our disposition, we do not reach Carradine's additional contention that reversal is required because the trial court failed to provide the minimal procedural safeguards required for probation revocation proceedings. *See Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

2. The sentencing colloquy between the trial court and Carradine continued as follows:

> THE COURT: However, Mr. Carradine, I want you to understand that whereas 70 may be passing in school, as far as I am concerned, 99 is flunking on probation. I require at least a 100 per cent cooperation and compliance while on probation. If not, you understand what you are faced with.
>
> \* \* \* \* \* \*
>
> The rehabilitation portion of the sentence is an opportunity for you to continue the progress, the dramatic progress you have made with Stepping Stones.
>
> But the slightest deviation from the conditions of probation, or any slip back, will result in immediate revocation of probation. I am not going to tell you not to drink, that's up to you. I'm not going to sit up here and set down an impossible condition. It's nothing I have any control over; however, if you do drink–you may not change–in addition, one condition is, you may not change any of these conditions, including leaving the Stepping Stones program without written approval from me.
>
> Do you understand that, sir?
>
> MR. CARRADINE: Yes, sir.
>
> THE COURT: If there is no written approval from me and you change any of these conditions or refuse to comply with them, then your probation will be immediately revoked.
>
> You have had a lot of support from extra–judicial organizations, you have considerable

The first court review of Carradine's compliance took place on September 12, 1978. On that occasion, the court learned that the Stepping Stones program had ceased operating sometime in August because of financial difficulties, and that Carradine, since that time, had been living with his former alcoholics counselor in Mt. Rainer, Maryland, as well as maintaining a room at Oxford House in northeast Washington. The court initially expressed concern over the instability of Carradine's living arrangements and lack of employment.[3] At the end of the hearing, however, the court endorsed the joint recommendation of Carradine's probation officer and his therapist that the living arrangements, as of that time, continue. The court also urged Carradine to find paid employment in addition to the training programs and volunteer work with which he was then involved.

Two days after the hearing, appellant voluntarily reappeared in court before the sentencing judge to request assistance in obtaining more intensive psychotherapy and possible hospitalization.[4] He acceded to the court's suggestion that he be committed forthwith to the Ugast Psychiatric Pavillion at D.C. General Hospital for an observation period.[5] The court emphasized to Carradine, however, that it was not revoking probation at this time.[6]

The court set October 18, 1978, as the date for further hearing. Primarily because of delays in obtaining an evaluation of Carradine, the court continued his confinement at Ugast Pavillion for several months. Finally, on December 18 and 19, 1978, Carradine came before the court, once again, to request release. He asked permission to stay at a private half way house where a space was reserved for him. Although the probation officer at no time had requested revocation of Carradine's probation, and the prosecutor made no claim that Carradine had violated his probation, the prosecutor moved for revocation, contending that Carradine should be incarcerated for the protection of the public. Over defense objection,[7] the court revoked Carradine's probation, giving the following reasons:

> I'm convinced that alcoholism is not the real problem. The problem is one that has extended from Mr. Carradine's childhood and very frankly doesn't appear under the present situation to be improving.

---

support from your family and friends in the community. I understand full well the trauma the victim in this case went through and is still suffering from, but I believe it is in her interest, as well as in the interest of the public in general for you to receive the sentence which I imposed.

3. THE COURT: You may be seated. Mr. Mertens, I am concerned over, very frankly, Mr. Carradine's present living arrangements and the fact that he doesn't seem to be moving ahead in any way. And based upon what I have heard I am concerned that Mr. Carradine may well be headed for a situation [in] which he might become frustrated or upset and become involved in another incident or start drinking again.

Very frankly unless I can be assured of a reasonable living arrangement and employment or schooling and unless I know what he is doing constructively during the day and evening hours I am going to have to revoke his probation. Now, I will hear from you. I want to tell you what I am concerned about.

4. The suggestion that more intensive therapy and a period of hospitalization might be beneficial apparently came from Carradine's therapist.

5. The court's order sought a mental examination pursuant to D.C.Code 1973, § 24–301(a) to determine Carradine's competency "to stand Probation Revocation hearing."

6. The court told Carradine:
> I want you to understand at this point your probation is not being revoked. We are doing this to assist you, not to punish you....
>
> \* \* \* \* \* \*
>
> ... As I said, it is not punishment in any way, shape or form nor does this mean your probation is revoked but merely to provide you and I and your attorney, the Government and all of those who are wishing you well with the tools to build on.

7. Defense counsel argued that the government's motion was tantamount to "ask[ing] Your Honor to wipe the slate clean as to the original sentencing and in a sense to resentence Mr. Carradine as though we were back on square one[,] as though we were back on the original sentencing day in this case, which, of course, it isn't."

I have reluctantly come to the conclusion at this time that Mr. Carradine is a walking time–bomb, because, I believe, that his problems are, while chronic in nature, more likely to manifest themselves accutely [sic] by spontaneous generation [of] which he may not be aware and of which–over which he has little control.

\* \* \* \* \* \*

... The Court is going to order the defendant be committed to the Federal Hospital at Springfield, Missouri or to the new Federal facility at Buckner [sic; Butner], North Carolina, with parole at the discretion of the Parole Board.

I feel that ... Mr. Carradine needs intensive, twenty–four hour a day therapy, which cannot be provided on an out–patient basis. . . .

I will speak to the Bureau of Prisons today and ask that he be moved to a Federal Hospital immediately even if at this time it's a temporary location. He does not belong in jail but he does belong in a hospital surrounding.

The court then reduced Carradine's sentence to prison for a term of two years to life, with a recommendation that he be placed in a federal hospital.[8]

## II.

Carradine contends that the trial court's revocation of his probation, in the absence of an allegation or proof that he had violated a condition of that probation, constituted a denial of his Fifth Amendment right to due process. He also asserts that the revocation, in any event, was an abuse of trial court discretion.

A. Since 1973, it has been clear that constitutional due process extends to probation revocation procedures. That was the year the Supreme Court decided *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), incorporating the analysis and adopting the procedural safeguards it had outlined a year earlier for minimum due process in parole revocation procedures. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Specifically, in *Gagnon, supra*, the Supreme Court acknowledged that the following analysis applies equally to probation and parole revocations:

> "The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation?" [*Id.* 411 U.S. at 784, 93 S.Ct. at 1760 (quoting *Morrissey, supra* at 479–80), 92 S.Ct. at 2599.]

Three weeks after *Gagnon, supra*, the Court decided *Douglas v. Buder*, 412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973) (per curiam), reversing the trial court's revocation of petitioner's probation because the Court could perceive no violation of the conditions of that probation. The trial judge had ruled that petitioner's failure to report a traffic citation violated a condition requiring him to report " '[a]ll arrests ... without delay.' " *Id.* at 430, 93 S.Ct. at 2200. The Supreme Court held that this ruling was "so totally devoid of evidentiary support as to be invalid under the Due Process Clause of the Fourteenth Amendment." *Id.* at 432, 93 S.Ct. at 2200. In reaching this conclusion, the Court rejected the government's argument that the order revoking probation should be viewed as a determination by the trial judge that, under applicable state law, a traffic citation is the equivalent of an arrest, even though it is not accompanied by actual restraint.

---

8. At argument, Carradine's counsel informed this court that although Carradine had spent several months at the federal hospital facility in Springfield, Missouri, he was subsequently transferred to (and was currently incarcerated in) a federal prison. The parties agree, moreover, that Superior Court judges have no authority to direct incarceration, let alone treatment, at a particular federal institution. Although a judge may make a recommendation that the convicted person receive treatment at a specified institution, such a recommendation is not binding on the Attorney General.

[E]ven if it were clear that [the trial judge] had declared Missouri law to be that a traffic citation is the equivalent of an arrest, we would have to conclude that under the rationale of *Bouie v. City of Columbia*, 378 U.S. 347 [84 S.Ct. 1697, 12 L.Ed.2d 894] (1964), *the unforeseeable application of that interpretation in the case before us deprived petitioner of due process.* [*Douglas, supra,* 412 U.S. at 432, 93 S.Ct. at 2200 (emphasis added).]

In summary, the Supreme Court established in the *Morrissey–Gagnon–Douglas* trilogy that probation may not be revoked in the absence of a threshold determination that there has been a "violation" of the

express conditions of probation, or of a condition so clearly implied that a probationer, in fairness, can be said to have notice of it.[9]

The decisions of this court under D.C. Code 1973, § 24–104[10] implicitly have acknowledged this "foreseeable violation" principle.[11] Moreover, courts in other jurisdictions have held that in the absence of an express or clearly implied violation, a revocation of probation would either deny due process[12] or reflect an abuse of trial court discretion.[13] Still other courts, without expressly citing due process or abuse of discretion, have recognized that revocation is improper unless a probationer has violated the

9. For example, as Carradine himself recognizes, "there is implied within every grant of probation a condition that the probationer not violate the law while on probation." *Wright v. United States,* D.C.App., 315 A.2d 839, 842 n.7 (1974).

10. D.C.Code 1973, § 24–104, provides in part: At any time during the probationary term the court may modify the terms and conditions of the order of probation, or may terminate such probation, when in the opinion of the court the ends of justice shall require, and when the probation is so terminated the court shall enter an order discharging the probationer from serving the imposed penalty; or the court may revoke the order of probation and cause the rearrest of the probationer and impose a sentence and require him to serve the sentence or pay the fine originally imposed, or both, as the case may be, and the time of probation shall not be taken into account to diminish the time for which he was originally sentenced. We have interpreted § 24–104 as a broad grant of authority, permitting "the [trial] court great leeway and flexibility to tailor the decision on [revoking]· probation to each probationer's needs." *Jacobs v. United States,* D.C.App., 399 A.2d 38, 41 (1979); *cf.* 18 U.S.C. § 3651 (1976) ("The court may revoke or modify any condition of probation, or may change the period of probation").

11. *See, e. g., Short v. United States,* D.C.App., 366 A.2d 781, 784 (1976) (affirming revocation when defendant admitted that he unlawfully carried a 9–mm. pistol, engaged in gambling activities during his probationary period, and made false statement to police during investigation); *Wright v. United States,* D.C.App., 315 A.2d 839, 841 (1974) (affirming revocation when, prior to probationary term, appellant willfully left and failed to return to the place of confinement designated in his work release

plan); *Stevens v. District of Columbia,* D.C. Mun.App., 127 A.2d 147, 149 (1956) (affirming revocation when probationer, against whom judgment of paternity had been entered, had received repeated warnings that arrearages in support payments would result in revocation); *Cooper v. United States,* D.C.Mun.App., 48 A.2d 771, 772 (1946) (affirming revocation when probationer failed to report to probation officer); *Basile v. United States,* D.C.Mun.App., 38 A.2d 620, 622 (1944) (affirming revocation when probationer–employer failed to comply with express condition that he pay restitution for loss sustained by injured employee); *cf. Jacobs, supra* at 43 (trial court abused its discretion by revoking probation when court was fully informed of probationer's violations in January 1976, of a study under Narcotics Addicts Rehabilitation Act in April 1976, and of a NARA commitment in October 1976, but waited ten months until August 1977 to revoke).

12. *See, e. g., United States v. Reed,* 573 F.2d 1020, 1023 (8th Cir. 1978) ("due process requires adequate proof of the alleged violations of the conditions of probation"); *Tiitsman v. Black,* 536 F.2d 678, 682 (6th Cir. 1976) ("notice of the probationary status and the conditions thereof would be constitutionally required to underlie probation revocation based on violating those conditions").

13. *See, e. g., United States v. Crocker,* 435 F.2d 601, 604 (8th Cir. 1971) ("the trial court abused its discretion in revoking defendant's probation solely upon the basis of his failure to register for the draft when the court at no time made registration a condition of probation"); *cf. People v. Welch,* 78 Ill.App.3d 184, 186, 33 Ill.Dec. 761, 763, 397 N.E.2d 94, 96 (1979) (reversing revocation when appellant was not proved solely culpable for failure to obtain psychiatric treatment ordered as condition of probation).

law or the clearly understood terms of probation.[14]

B. In the present case, the government alleges that Carradine violated his probation, in effect, by failing to meet an implied condition: that he "effectively respond to his present living arrangement and outpatient counseling" and, as a result, "meet the rehabilitative goals of his probation." The government consequently argues that "where psychiatric treatment is a condition of probation," a failure to get better, rather than an overt violation of the probation order, will justify revocation. More specifically, according to the government, the court was empowered to revoke Carradine's legal status as a probationer after applying the "same criteria" it originally used and finding, on the basis of Carradine's probation experience, that he was "not responding to the rehabilitative program and that the best interests of the public and probationer require[d] revocation."

We cannot agree.[15] As explained in Part II.A., *supra*, the probationer must have acted, or failed to act, in a way that foreseeably could result in revocation. *See*

*Douglas, supra,* 412 U.S. at 432, 93 S.Ct. at 2200. It is most unlikely that Carradine could have foreseen that his request for additional psychiatric assistance–which was not premised on an antisocial act–would be deemed the equivalent of a probation violation. *Cf. id.* (traffic citation not foreseeable equivalent of probation violation). His probation order did not imply vulnerability to revocation–with the consequence of imprisonment' without credit for the time on probation, *see* D.C.Code 1973, § 24–104–simply for failing to get better or requiring additional psychiatric help. To the contrary, Carradine's voluntary appearance in court seeking more intensive therapy–which the government acknowledged was "to his credit"–is a clear example of a probationer's extra effort to comply with the spirit, as well as the letter, of his probation. We conclude that maintenance or achievement of a particular level of mental stability was not an implied condition of Carradine's probation. The trial court accordingly deprived Carradine of due process by revoking his probation (absent any violation) solely on the basis of his mental problems.[16]

---

14. *See, e. g., United States v. Landay,* 513 F.2d 306, 308 (5th Cir. 1975) ("[i]n considering the revocation of probation the trial court must convince itself that the defendant has not in good faith attempted to comply with the conditions of his probation"); *United States v. Foster,* 500 F.2d 1241, 1244 (9th Cir. 1974) (vacating revocation based on failure to maintain contact with probation department when probationer had not been informed of obligation to report to department or advise probation office of change of address); *United States v. Chapel,* 428 F.2d 472, 474 (9th Cir. 1970) (reversing revocation based on probationer's antiwar activities, when sentencing judge had recognized the depth of probationer's antiwar sentiments but failed to prohibit such activities as condition of probation).

Additionally, the American Bar Association views a "violation" of a probation condition to be "both a necessary and a sufficient ground for the revocation of probation." ABA, Standards Relating to Probation § 5.1 at 56 (Approved Draft, 1970).

15. The government's position is reminiscent of the argument that probation is a revocable privilege, not a right protected by due process. However, in *Gagnon, supra,* the Supreme Court expressly put that notion to rest: "It is clear at least after *Morrissey v. Brewer,* 408 U.S. 471,

92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that a probationer can no longer be denied due process, in reliance on the dictum in *Escoe v. Zerbst,* 295 U.S. 490, 492, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935), that probation is 'an act of grace.'" *Gagnon, supra* at 411 U.S. 782 n.4, 93 S.Ct. at 1760 n.4.

16. In concluding that the sentencing judge here did not include, as a condition of probation, the requirement that Carradine–to avoid revocation–must maintain a prescribed level of mental stability (through psychiatric outpatient care or otherwise), *see* note 2 *supra,* we do not decide whether the judge lawfully could have done so. Revocation solely in response to a probationer's mental state, without regard to whether that condition had produced an antisocial act, would present the complex question whether such revocation, resulting in incarceration, would result in unconstitutional punishment for a status or disease. *Compare Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (statute making narcotics addiction a misdemeanor, punishable by imprisonment, violates the Eighth and Fourteenth Amendments) *with United States v. Webster,* 161 U.S.App.D.C. 1, 4–5, 492 F.2d 1048, 1051–52 (1974) (suggesting that probationer's demonstrated disregard for family

### III.

We recognize that in holding probation may not be revoked under these circumstances, we confront the sentencing judge with a possible dilemma: although the judge may be inclined to probation, he or she may be reluctant to risk it unless the court has an effective alternative, short of revocation, in the event the probationer should develop a need for inpatient psychiatric care.

Without attempting an exhaustive analysis of alternative procedures, absent the benefit of a concrete case, we believe it is important to indicate that the court does have useful options which are not precluded by this opinion. First, when a probationer volunteers for hospitalization—as Carradine did in this case—the court may authorize (as consistent with probation) the requested voluntary hospitalization. *See* D.C.Code 1973, §§ 21–511, –512. Also, the court, in supervising the probationer, *see* D.C.Code 1973, §§ 16–710, 24–104, may modify the terms of probation, imposing any new condition "reasonably related to the rehabilitation of the convicted person and the protection of the public." *Moore v. United States*, D.C.App., 387 A.2d 714, 716 (1978) (per cu-

riam) (upholding condition requiring a mental examination and, if necessary, psychological treatment).[17]

### IV.

In summary, because Carradine has not " 'acted in violation of one or more conditions' " of his probation, *Gagnon, supra* 411 U.S. at 784, 92 S.Ct. at 1760 (quoting *Morrissey, supra* 408 U.S. at 479, 92 S.Ct. at 2599), we hold that the trial court violated his Fifth Amendment right to due process by revoking probation in response to his request for additional psychiatric treatment or hospitalization. We do not, however, foreclose court–approved voluntary hospitalization or court–imposed modification of probation whenever his condition so warrants. We therefore reverse the trial court's revocation order.

*So ordered.*

members or the community may justify revoking probation) *and Hyser v. Reed*, 115 U.S.App. D.C. 254, 281, 318 F.2d 225, 252 (Bazelon, C. J., with Edgerton, J., concurring in part and dissenting in part) ("[p]robation may be revoked solely on the basis of predictive judgments about likely future behavior"), *cert. denied*, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963).

17. We do not reach the question whether, absent civil commitment proceedings under Title 21 of the District of Columbia Code, the court could impose inpatient psychiatric care as a modification of probation.